ZEPHYR OIL CO. v. COCKBURN.

No. 12004.

Court of Civil Appeals of Texas. Galveston.

Oct. 21, 1948.

Motions for Rehearing Denied Nov. 18, 1948.
Second Motions for Rehearing Denied
Dec. 23, 1948.

Elledge & Elledge, of Houston, for appellant .

J. L. Webb, of Houston, for appellee.

CODY, Justice.

This suit was brought by appellant, a corporate oil well driller, against appellee, an oil operator, to recover a balance alleged to be due for the drilling two wells in exploring for oil and gas in Falls County. By cross-action, appellee sought to recover amounts which he alleged he advanced to appellant during the operations, and which he alleged appellant agreed to repay. The wells were known as Gilliam No. 1, and Buie No. 1. They were completed as dry holes.

Appellee entered into a written contract with an officer of appellant by the terms of which said officer personally bound himself to drill the Gilliam well for the consideration of $50,000.00 in money, and a third of the oil well and the oil rights of appellee in the tract on which the well was to be drilled, and for an additional consideration of certain oil leases. With the consent of appellee, this contract was assigned to appellant. After the Gilliam well was abandoned, the parties entered into a written contract by which appellant was obligated to drill the Buie well for a money consideration of $30,000.00, and the terms of the contract were otherwise very similar if not identical with the terms of the first contract.

In its suit appellant sought an accounting and an appropriate recovery on the following items:

(1) $12,257.00, the cost of fishing a sidewall sampling gun belonging to the Schlumberger Well Surveying Corporation out of the Gilliam well.

(2) $6,500.00 alleged to be two-thirds of the cost of the extra testing of the Gilliam well, which it was alleged that appellee orally agreed to pay.

(3) Appellant alleged that appellee was liable for two-thirds of the sum of $20,282.-50, which appellee paid for material and equipment in the completion of the Gilliam well.

(4) $7,815.10, the cost of extra work done by appellant upon the Buie well which it was alleged that appellee had orally agreed to pay.

Appellant's petition concludes: "Because of the foregoing written contracts and oral agreements and the other facts hereinabove alleged, defendant H. C. Cockburn is obligated to pay to plaintiff Zephyer Oil Company the sum of $15,070.96 in connection with the drilling of Gilliam No. 1 well and the sum of $7,815.10 in connection with the drilling of Buie No. 1 well", making a total of $22,886.06, for which appellant sued. Appellant sought to recover the entire cost of the fishing job. It was not disputed that appellee had not paid the last $2,500.00 of the $50,000.00 cash consideration.

Appellee urged various motions for a directed verdict. Both sides urged objections to the charge as given, which submitted the case upon 45 special issues, and both sides urged the submission of specially requested special issues. Upon the coming in of the verdict, appellant filed a motion to set aside certain of the jury's findings and for judgment upon certain of the findings notwithstanding other findings, and in said motion requested the court to make certain additional findings. Appellee also urged that certain of the findings of the jury be disregarded and asked that judgment be rendered for him upon certain other findings.

The court granted in part and refused in part the aforesaid motions, and rendered judgment:

(a) For appellant in the sum of $16,815.-10; and

(b) For appellee in the sum of $16,925.-42.

The sum, so adjudged that appellant was entitled to, was made up of these items:

The cost of the extra testing in the Gilliam well (jury's answers to special issues 18, 19, 20), $6,500.00;

The extra cost on the Buie well (jury's answers to special issues 24, 25, 26, 27, 40, 41), $7,815.10:

Unpaid balance of $50,000.00,.....$2,500.00

Total          $16,815.10

The sum of $16,925.42, which the court awarded appellee, was made up as follows: It was not disputed that appellee had paid the sum of $20,282.50 for material and extra work done on the Gilliam well. Of this sum appellee paid McCullough Tool Company for testing, $5,431.03. Of the said sum of $5,431.03, it was undisputed that $395.40 was the exclusive obligation of appellant. Two-thirds of the balance after $395.40 was deducted from $5,431.03, or $3,357.08, was found to be appellee's obligation. The sum of $20,282.50 paid out by appellee on the Gilliam well (other than cash payments out of the $50,000.00 cash consideration), less the sum of $3,357.08, amounts to the sum awarded to appellee, $16,925.42.

The court by judgment awarded execution to the appellee for the sum of $110.32, being the excess of the sum awarded appellee over the sum awarded appellant. Costs were taxed equally against both parties. Both parties excepted to the judgment, but only appellant filed a motion for new trial, and appealed.

Appellant prosecutes this appeal upon 13 points, being substantially as follows:

1. The court should have awarded the cost of the fishing job in the Gilliam well to appellant, and not to appellee.

2. The court should have adjudged two-thirds of the cost of casing, tubing, cement and cementing the Gilliam well to appellant.

Appellant's points 2 to 13, inclusive, relate to procedural matters, such as the court's declining to re-open the evidence after the parties closed; the court's refusal to give certain special issues; the complaint that the answers of the jury to certain special issues rendered the verdict so fatally defective that no judgment could be rendered thereon; the court's refusal to admit certain evidence; the court's exclusion of certain evidence; and the giving of special issue No. 37 is asserted to have been reversible error. These procedural points will be discussed after we dispose of the first two points.

In order to understand the first point, which we overrule, it is necessary to make a detailed statement.

Paragraphs 3 and 4 of the contract covering the Gilliam read in part as follows:

Paragraph 3. "In the drilling of said well, the Second Party (appellant) shall at his own expense take such cores and make such drill stem tests as in his judgment are deemed advisable, and is to stand by, at his own expense, while the Schlumberger is being run. (It is now contemplated running the electric at 3000 feet, 6000 feet and on completion). *All Schlumberger expense is to be paid by the First Party.* The Second Party shall at his own expense furnish all equipment, including derrick, bits, fuel, labor, insurance, hauling and everything in connection with the drilling of the well under this agreement. * * *" (Emphasis supplied).

Paragraph 4. "Second Party shall drill said well as an independent contractor, and as such, except as herein provided shall save and hold First Party harmless from all expenses and liability incurred in the performance of this contract. * * *"

The Schlumberger electric logging device, which is a device for taking pictures, was run in the Gilliam well by the Schlumberger Well Surveying Corporation on two separate occasions and at two successive depths without incident prior to February 6, 1945. On that day a depth of 6852 feet was reached, and a crew of the Schlumberger Company was summoned to take another electric. Appellant "stood by" for this operation to be made; its tools were

withdrawn. The Schlumberger made the electric without incident, and the film was developed in a few minutes. It was then decided to have the Schlumberger take sidewall samples. For the purpose of passing on this point, the facts will be taken as evidencing the disapproval by appellant of having the Schlumberger take sidewall samples on the ground that there was too much danger of the sampling gun getting stuck in the hole. After five samples were taken at five different depths without incident, the gun became stuck on the sixth shot. The Schlumberger winch did not have enough power to withdraw the gun. The foreman of the Schlumberger crew requested appellant to run the drill pipe beside the cable attached to the gun and try to wash the gun loose. This proved unsuccessful, and the foreman of the Schlumberger instructed or asked the appellant to remove its pipe, and informed appellant that he had a tool (the Bowen Overshot) which would pass down the hole, over the cable and loosen the gun. Appellant began withdrawing its pipe about 9:00 P.M., on February 6th. At about 11:00 P.M., when about 15 or 16 stands of pipe remained to be withdrawn, the foreman of the Schlumberger left for Tyler to get the tool referred to. At midnight a new drilling crew went on duty. A roughneck of appellant's crew testified that the first time he touched the "slip", he cut the cable in two. The "slip", or wedge of steel, fits inside the rotary table, against the drill pipe, and holds the drill pipe which is in the hole while the stand of pipe is being screwed on or unscrewed. When the cable parted, the gun was stuck in the bottom of the hole, and about 7000 feet of cable attached to it was loose in the hole. After the cable was cut there was no use to bring the overshot tool. Before drilling could be resumed, the cable and gun had to be removed, and the hole reconditioned.

There is a general reference in appellant's pleadings to the contract covering the drilling of the Gilliam well, and to the provision that appellant was thereby obligated to "stand by" at its own expense, "while the Schlumberger is being run, and that all Schlumberger expense is to be paid by Cockburn". But when appellant descends to particular allegations, it alleges that "under the terms of the contract and by custom in the industry Cockburn was obligated, upon completing the Schlumberger work, to return the well to Zephyr Oil Company in as good condition as it was when Zephyr stood by and Cockburn took over for the purpose of having Schlumberger work done". Appellant then alleged a usage and custom in the business of drilling oil wells in the State of Texas "Where the contract for drilling an oil well contains provisions such as these found in this contract, the party to the contract desiring the well to be drilled * * * is responsible for the condition of the well from the time the drilling contractor * * * stands by for the running of the Schlumberger until all of the work to be done by Schlumberger is completed and the well is re-delivered to the drilling contractor for the purpose of continuing the drilling * * *".

Then by its First Amended First Supplemental Petition, in answer to appellee's plea that the Schlumberger Well Surveying Corporation was an independent contractor, appellant alleged that such answer by appellee was immaterial "because plaintiff is suing on a contractual obligation (the obligation of defendant to return the well to plaintiff in as good condition as it was when plaintiff stood by for Schlumberger work to be done), but insofar as it has materiality, plaintiff pleads in reply that the Schlumberger work to be done was inherently dangerous to the well, in that there is great inherent danger of obstructing the well by running the Schlumberger devices * * *".

Thus it is seen that appellant's general broad reference to the contractual obligation of appellee to pay "all Schlumberger expense" was pointed and limited by particular allegations of the existence of a custom which obligated the owner to return the well to the contractor in as good condition as when the contractor stood by.

■ It appears that upon the trial appellant relied for its recovery on the custom which it pled, and upon the inherently dangerous character of the work done by the

Schlumberger Corporation to fix liability on appellee for the cost of the fishing job. The jury found against appellant both with reference to the existence of the custom it pled, and on the highly dangerous character of the work. Appellant then, after the jury had so found adversely to it, for the first time urged that the contract bound appellee to pay the cost of the fishing job by its express terms. In other words, appellant in its motion for judgment notwithstanding certain jury findings, took the position that appellee's contractual obligation to pay "all Schlumberger expenses", was an obligation to pay all damages caused by the operations of an independent contractor. Citation of authority is not required in support of our holding that appellant cannot thus be allowed to change the ground on which it predicated appellee's liability.

■ Appellant did not plead that the contract requiring appellee to pay "all Schlumberger expense" was ambiguous, and now asserts that it is unambiguous. If the provision in question is subject to the construction which appellant now seeks to have placed on it, namely, that appellee shall pay the cost of restoring the hole to the condition it was in when appellant "stood by", it is ambiguous. In order to have such meaning written into the contract, prior to the findings of the jury, appellant alleged a custom. It did not allege that appellee was liable by the terms of the contract, and then in the alternative, allege a custom that made appellee liable. We find ourselves in agreement with what seems to us to be appellant's first view, namely, that in order to establish that the parties intended that appellee should be obliged to bear such cost, a custom would have to be alleged and proved. We cannot hold that the contract unambiguously means what appellant contends that it means, or that, in the state of the record, the trial court could so hold. The court did not err in refusing to construe the contract so as to hold appellee for the cost of the fishing job.

We overrule appellant's first point.

In order to understand appellant's second point, which we sustain, it is necessary to make an additional detailed statement.

This point also arises with reference to the Gilliam well and involves particularly the construction of paragraph V of the contract which reads in part:

"In the drilling of this well, should an oil, gas or distillate sand be encountered which in the judgment of the parties would produce in paying quantities, the Second Party (appellant) will set 5-½ inch casing and complete the well into the tanks at his own expense. *It is understood, however, in this connection, that Second Party, owning a one-third (⅓) interest in the well, will pay one-third (⅓) of the cost of the casing, cementing, Halliburton, Christmas tree, tanks and all other equipment used for such completion, First Party paying the remaining two thirds (⅔), but the cost of labor at all times will be borne by Second Party.*" (Emphasis supplied).

"Oil, gas or distillate sand" *was* "encountered which in the judgment of the parties would produce in paying quantities." And the Second Party did set 5-½ inch casing and in this action seeks to charge appellee with two-thirds (⅔) of the cost of the casing, cementing, Halliburton, Christmas tree and equipment used for the completion. Appellant did not furnish any tanks. The hole was dry. But the evidence was to the effect that the tanks were available. Appellant does not seek in this connection to charge appellee with any costs in connection with the tanks whatever. It was the view of appellee, which was adopted by the trial court, that he was liable for two-thirds (⅔) of the cost only in case that the well was completed into the tanks as a producing well. Hence, in view of the fact that the well was admittedly completed as a dry hole it is appellee's contention that he was not liable for the payment of the remaining two-thirds (⅔) of the cost of the equipment.

■ We have considered the authorities cited by the parties in support of a construction favorable to their respective contentions. Cases in which contracts have been construed, except as they lay down general rules for construction are rarely of any assistance in arriving at the proper construction of a particular contract. "In all

rules of construction of contracts, the dominant purpose is to ascertain, if it be possible, what was in the minds of the parties to the contract at the time it was made." Texas & Pacific Coal & Oil Co. v. Harris, Tex.Civ.App., 230 S.W. 237. It is quite clear in the contract under consideration that it was the purpose of appellee, acquiesced in by appellant, that his obligation and liability should be limited to such as he specifically and expressly assumed by the terms of the contract.

The obligation of appellant was to drill the well to a specific depth. Appellant was under no obligation to provide the equipment and material specified in paragraph "V", unless in the joint judgment of the parties, a sand was encountered from which production could be had in paying quantities. But in line with the dominant purpose expressed in the contract that appellant should bear the entire cost of the making of the well, except as otherwise expressly stated, it is first provided in said paragraph that appellant shall set 5-½ inch casing and complete the well into the tanks at his own expense. By so expressing the contract this would make it clear that appellee was to bear none of the expense in completing the well except such as he expressly assumed in the following sentence.

In the following sentence it is provided that, with respect to the items there enumerated, the parties shall bear the expense in the proportion of one-third and two-thirds, and the reason for so doing is given. That is the proportion in which they own the well. And since the expense could be incurred only if appellee was of the opinion that a paying sand had been encountered, he was protected against any improvidence of judgment on the part of appellant. The well was equally completed in conformity with the joint judgment of the parties whether that judgment, that the well was a producer, was justified by the event.

■ In this connection it need hardly be noted that appellant is not entitled to have a letter which was written by appellee, but which was not admitted in evidence, considered as a practical construction placed thereon by appellee. The letter is in the record only in connection with a bill of exception complaining of the court's refusal to re-open the evidence for its admission, and has been considered only in that connection.

■ We hold that under the undisputed facts, and by the terms of paragraph "V", appellant was entitled to recover two-thirds of the costs of the items so enumerated in paragraph "V". We hold that it was sufficient for appellant to have had the tanks available. It was not necessary to connect the dry hole with tanks.

Appellant's third, fourth, fifth and sixth points are submitted only alternatively, to be considered by the court only in case its second point is not sustained.

■ Appellant's seventh point complains that there is a conflict between the jury's answers to the fifth and sixth special issues. The jury found (Special Issue No. 5) that appellant "stood by" for the Schlumberger work to be done. It was also found that appellant did not turn the control of the well over to appellee for the doing of the Schlumberger work. Appellant formally stipulated, that on the occasion in question, the Schlumberger corporation was acting as an independent contractor. The Schlumberger corporation was not, therefore, the agent, representative or alter ego of appellee. See Cocke & Braden v. Ayer, Tex.Civ. App., 108 S.W.2d 946; Seismic Exploration Co. v. Dobray, Tex.Civ.App., 169 S.W.2d 739; Empire Gas & Fuel Co. v. Conch, Tex. Civ.App., 226 S.W. 1103, 1106. There was no material conflict in the jury's answers. The seventh point is overruled.

■ Appellant's point eight complains that there is such a conflict (between the answers of the jury to Special issues No. 12 and 31a in response to which the jury found that appellant acquiesced in the taking of sidewall samples, and that the taking of sidewall samples was mutually agreed upon between appellant and appellee, and the answers of the jury to special issues 31 and 32, in response to which the jury found that Vess Taylor (an official of appellant) did not instruct the Schlumberger corporation to take sidewall samples, and that appellant made a protest to the taking of sidewall samples,) that the verdict is self-des-

tructive, and no judgment can be rendered thereon. We have carefully considered the point. It is fully answered by appellee, and no good purpose would be served in discussing the issues in detail. We overrule the point.

■ We overrule appellant's ninth point. It complains of the court's refusal to give a special issue requested by appellant. The request for the special issue is predicated upon the assumption that appellee was responsible for the acts of the Schlumberger corporation, which corporation appellant stipulated was an independent contractor on the occasion in question.

We overrule appellant's tenth· point, which complains of the admission of testimony by a roughneck on appellant's crew as constituting reversible error.

Appellant complains, by its eleventh point, of the court's admitting, over the objection of appellant that it was hearsay, the testimony of a witness as to what an official ·of appellant had told him as to how the accident happened. We overrule the point.

By its twelfth point appellant complains ·of the exclusion of testimony by the foreman of the Schlumberger's crew as to the inherent danger to life involved, should the derrick have been pulled down in seeking to withdraw the Schlumberger device. Such testimony had no bearing on the inherent danger to the hole, of operating the Schlumberger device. The point is overruled.

■ By its thirteenth point, appellant complains of the submission of Special issue No. 37, over the objection that the issue ·constituted a charge on the weight of the evidence. The issue complained of reads:

"Do you find from a preponderance of ·the evidence that the acts of the agents, servants and employees of the Zephyr Oil ·Company in attempting to remove the drill pipe from the Gilliam No. 1 well was the proximate cause of the loss of the time and ·expense incurred, if any, by plaintiff,

Zephyr Oil Company?" To which the jury answered "Yes".

The issue was a defensive issue under appellee's pleadings and the evidence. It was not on the weight. Gulf C. & S. F. Ry. Co. v. Shults, 61 Tex.Civ.App. 93, 129 S.W. 845.

We do not understand that the amount of the cost of the casing, tubing, cement and cementing in the Gilliam well is in any way contested, but that the controversy is whether appellee was ,liable for two-thirds thereof under paragraph "V". The judgment of the trial court is reversed insofar as it failed to award recovery to appellant of the said item, amounting to $9,450.-80. By deducting the sum of $110.32, which was the sum for which the court decreed execution issue for appellee, there remains the balance in favor of appellant of $9,-340.48. Except as so modified, the· judgment is affirmed.

Affirmed in part and reversed and rendered in part.

On Second Motions for Rehearing.

We have found no unusual difficulty in deciding the principal legal issues in this case, namely, (a) that appellee was not liable for the sum of $12,257.00, which was the cost of the fishing job, and (b) that appellee was liable for two-thirds of the cost of casing, tubing, cement and cementing the Gilliam. But we have found the method of accounting employed by appellant with the laudable purpose of simplifying the case somewhat confusing. We have concluded that its pleading was sufficient to put all items in issue, and that our holding with respect to its second point (designated as "(b)" hereinabove) requiring the judgment rendered in our original opinion. was correct.

Therefore, appellee's second motion for rehearing, including his original and amended motions to correct this Court's judgment, and appellant's second motion for rehearing are refused.

Motions refused.